UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

PAUL FRIEDMAN, et al.            ]
                                 ]
v.                               ]        No. 1-00-0065
                                 ]        Judge Higgins
GILES COUNTY ADULT-ORIENTED      ]
ESTABLISHMENT BOARD, et al.      ]

M E M O R A N D U M

The Court has before it the plaintiffs' motion (filed June 23, 2000; Docket Entry No. 16) for preliminary injunction, and their memorandum (Docket Entry No. 19) in support; and the defendants' responses (filed August 10, 2000; Docket Entry Nos. 22 and 27) in opposition to the plaintiffs' motion for preliminary injunction.

The plaintiffs seek declaratory relief in the form of an injunction under Fed. R. Civ. P. 57 and 65 and 28 U.S.C. §§ 2201 and 2202. The Court has jurisdiction over this matter under 42 U.S.C. § 1983, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4) and §§ 2201 and 2202.

For the reasons set forth below, the Court shall grant the plaintiffs' motion for injunction in part and deny it in part.

I.

The plaintiffs, Paul Friedman, sole proprietor of Expressway Books & Gifts,[1,2] and Jim Prince, sole proprietor of Club Utopia,[3]

---

[1]At the time of the preliminary injunction hearing on October 18, 2000, Expressway Books & Gifts had been in operation at its

filed this action on May 12, 2000, against the Giles County Adult-Oriented Establishment Board; Eddie Bass, in his official capacity as Sheriff of Giles County; T. Michael Bottoms, in his official capacity as District Attorney General for the 22nd Judicial District of the State of Tennessee; and Paul G. Summers, in his official capacity as Attorney General and Reporter for the State of Tennessee, seeking a preliminary injunction, permanent injunction and declaratory judgment determining the constitutionality of the Adult-Oriented Establishment Registration Act of 1998, Tennessee Code Annotated § 7-51-1101 et seq.[4,5]  On May 17, 2000, a hearing

---

current location for over three years.  It deals in the display, retail sale and rental of printed and pictorial materials, which include magazines, books and motion pictures recorded on film and/or video tape, and other paraphernalia of an erotic or sexual nature.   The store also has a theater where patrons may view sexually explicit movies; however, there is no live entertainment performed on the premises.  Ninety-five percent of the inventory is of a sexual nature.

[2]There is no issue presented as to whether any of the inventory in Expressway Books & Gifts is obscene or without constitutional protection.

[3]Club Utopia is a nightclub which has been in operation since September, 1999.   The nightclub features female entertainers, working as independent contractors, who perform semi-nude dances that include the exposure of their buttocks and breasts.   The entertainers wear opaque coverings over their nipples and areolae and full bikini thongs which cover their genitals and the cleft of their buttocks.

[4]Jennifer Edwards, a dancer at Club Utopia, was also a plaintiff in this action but apparently is no longer employed at Club Utopia.  In a companion case to this lawsuit, Belew v. Giles County Adult-Oriented Bd., 1:01-0139 (filed December 27, 2001), testimony at the bench trial on July 16, 2002, of that case revealed that Ms. Edwards as of that date had not worked at Club

2

was held before the Honorable William J. Haynes, Jr., sitting interchange for the Honorable Thomas A. Higgins, on the plaintiffs' motion (filed May 12, 2000; Docket Entry No. 3) for a temporary restraining order. The Court denied the plaintiffs' motion without prejudice for the reasons stated on the record. See order (entered May 17, 2000; Docket Entry No. 7). The plaintiffs subsequently filed their motion (Docket Entry No. 16) for preliminary injunction on June 23, 2000, and this Court held a hearing on the motion on October 18, 2000. See clerk's resume (filed October 18, 2000; Docket Entry No. 40). At the pre-trial conference on March 5, 2001, both parties agreed that there was no need for a trial and decided to let the Court decide the case based on the previously filed briefs and the evidence presented at the preliminary injunction hearing. See clerk's resume (filed March 5, 2001; Docket Entry No. 49). The plaintiffs were permitted to file a supplemental (filed March 30, 2001; Docket Entry No. 53) brief to which the defendants were to respond. See defendants response (filed April 9, 2001; Docket Entry No. 54) in opposition to the

---

Utopia for over six months. The Court therefore takes judicial notice of this fact, pursuant to Rule 201 of the Federal Rules of Evidence, and finds that Ms. Edwards lacks standing to assert her claims as a plaintiff in the instant case. Therefore, the Court will not address issues raised as to permits and the compulsory disclosure requirements of employees and entertainers.

    [5]Since the pre-trial conference on March 5, 2001, the Registration Act has been amended on two occasions with the amended provisions taking effect on May 10, 2001, and April 23, 2003, respectively.

3

plaintiffs' supplemental brief.  The plaintiffs now move for a permanent injunction.

The plaintiffs present a facial challenge to the constitutionality of the Registration Act.  Inter alia, the Registration Act requires that adult-oriented establishments[6] must be licensed[7] in order to operate as such and that all employees and entertainers working in such establishments are to have a valid permit to work there.  It further regulates the manner in which

_____

[6]Section 7-51-1102(6) defines what constitutes an "adult-oriented establishment."  That section states the following:

"Adult-oriented establishment" includes, but is not limited to, an adult bookstore, adult motion picture theater, adult mini-motion picture establishment, adult cabaret, escort agency, sexual encounter center, massage parlor, rap parlor, sauna, and further "adult-oriented establishment" means any premises to which the public patrons or members are invited or admitted and which are so physically arranged as to provide booths, cubicles, rooms, compartments or stalls separate from the common areas of the premises for the purpose of viewing adult-oriented motion pictures, or wherein an entertainer provides adult entertainment to a member of the public, a patron or a member, when such adult entertainment is held, conducted, operated or maintained for a profit, direct or indirect.  "Adult-oriented establishment" further includes, without being limited to, any adult entertainment studio or any premises that is physically arranged and used as such, whether advertised or represented as an adult entertainment studio, rap studio, exotic dance studio, encounter studio, sensitivity studio, model studio, escort service, escort or any other term of like import[.]

[7]"[N]o adult-oriented establishment shall be operated or maintained in any applicable county without first obtaining a license to operate issued by the county adult-oriented establishment board."  Tenn. Code Ann. § 7-51-1104(a).

4

entertainers may perform their dance routines."[8]  See Tenn. Code
Ann. §§ 7-51-1104 to -1106, 7-51-1114 to -1119.

_____

[8]Section 7-51-1114, as amended, provides in part:

(a)  No  operator,  entertainer  or  employee  of  an
adult-oriented establishment (either on the premises or
in  relation  to  the  person's  role  as  an  operator,
entertainer,  or  employee  of  an  adult-oriented
establishment) shall permit to be performed, offer to
perform, perform, or allow patrons to perform sexual
intercourse or oral or anal copulation or other contact
stimulation of the genitalia.

(b)  No  operator,  entertainer  or  employee  of  an
adult-oriented establishment shall encourage or permit
any person upon the premises to touch, caress or fondle
the breasts, buttocks, anus or genitals of any operator,
entertainer or employee.

(c)  No  entertainer,  employee,  or  customer  shall  be
permitted to have any physical contact with any other on
the premises during any performance and all performances
shall only occur upon a stage at least eighteen inches
(18') above the immediate floor level and removed at
least  six  feet  (6')  from  the  nearest  entertainer,
employee, and/or customer.

(d)(1) No employee or entertainer, while on the premises
of an adult-oriented establishment, may:

     (A) Engage in sexual intercourse;
     (B) Engage in deviant sexual conduct;
     (C) Appear in a state of nudity; or
     (D) Fondle such person's own genitals or those
     of another.

(2) For the purpose of this section, "nudity" means the
showing of the human male or female genitals or pubic
area with less than a fully opaque covering, the showing
of  the  female  breast  with  less  than  a  fully  opaque
covering of any part of the nipple, or the showing of the
covered male genitals in a discernibly turgid state.

5

Section 7-51-1120 of the Act provides that the provisions of Title 7, Chapter 51, Part 11, shall become effective in a particular county upon a two-thirds (2/3) vote of the county legislative body adopting the Act. Tenn. Code Ann. § 7-51-1120. On November 15, 1999, the Giles County Commission adopted the Registration Act for local application, and pursuant to § 7-51-1103(a) of the Act, the Giles County Adult-Oriented Establishment Board was created to carry out the provisions of the Act.

The Registration Act allows existing adult-oriented establishments 120 days from the effective date of the Act within which to apply for a license or they must cease operation. Tenn. Code Ann. § 7-51-1104(e). In a letter dated December 21, 1999, the Giles County Clerk, Emily Townsend, mailed information to Mr. Friedman along with other adult-oriented establishments informing them about the adoption of the Registration Act by the Giles County Commission and that they had 120 days to apply for a license. Clerk's resume (Docket Entry No. 40) hearing on preliminary injunction, attachment thereto, plaintiffs' exhibit 4.[9] On April 15, 2000, Mr. Friedman submitted to the board his application for a license to operate an adult-oriented establishment, namely an

---

[9]According to the testimony of Joseph Henry, Jr., the county lawyer for Giles County, the 120 days began to run from the time that it was believed that Mr. Friedman received Ms. Townsend's letter, which was surmised to be on December 24, 1999.

6

adult bookstore[10] called Expressway Books & Gifts. At the time of making his application for a license, Mr. Friedman had three or four employees working for him. He paid the application fees for these employees to obtain their permits as well.[11] At the time of the hearing, the applications of Mr. Friedman and his employees had neither been rejected nor accepted by the board, nor had the board notified Mr. Friedman as to whether the applications were being held for further investigation.

Mr. Prince, however, chose not to apply for a license during the 120-day grace period and instead restricted the content of the dance routines performed at Club Utopia in order to avoid violating any of the provisions of the Registration Act. Originally, when Club Utopia opened in September, 1999, the entertainers danced topless and wore bikini thongs, which covered their genitals and the cleft of their buttocks. In November, 1999, Mr. Prince decided

---

[10]Section 7-51-1102(1) of the Act defines "adult bookstore" as:

[A] business which offers, as its principal or predominate stock or trade, sexually oriented material, devices, or paraphernalia or specified sexual activities, or any combination or form thereof, whether printed, filmed, recorded or live and which restricts or purports to restrict admission to adults or to any class of adults . . . .

[11]At the time of the hearing, Mr. Friedman had three employees working for him at the bookstore. Of the employees who initially applied for a permit, only one was still working there. The other two employees had not applied for a permit.

7

to operate his club as an adult cabaret[12] and instructed the female dancers to wear "pasties," or coverings, over their nipples and areolae after being advised to do so by the Giles County Sheriff's Department.[13]   After Mr. Prince received the letter from Ms. Townsend in December, 1999, he decided against applying for a license and instead elected to have his entertainers switch from "pasties" and thong bikini bottoms to that of a full bikini, covering their entire breasts, genitals and buttocks.  Having been informed by the Giles County Adult-Oriented Establishment Board that it did not intend to enforce any of the provisions of the Registration Act pending resolution of the preliminary injunction motion, Clerk's resume (Docket Entry No. 40) hearing on preliminary injunction, attachment thereto, plaintiffs' exhibit 7, letter dated

---

[12]Section 7-51-1102(2) defines "adult cabaret" as:

[A]n establishment which features as a principal use of its business, entertainers and/or waiters and/or bartenders who expose to public view of the patrons within such establishment, at any time, the bare female breast below a point immediately above the top of the areola, human genitals, pubic region, or buttocks, even if partially covered by opaque material or completely covered by translucent material; including swim suits, lingerie, or latex covering. "Adult cabaret" includes a commercial establishment which features entertainment of an erotic nature including exotic dancers, strippers, male or female impersonators, or similar entertainers . . . .

[13]In 1994, the Tennessee State Legislature enacted the Tennessee Public Indecency Statute, Tennessee Code Annotated § 39-13-511, which makes appearing in public nude the crime of public indecency.

8

July 6, 2000,[14, 15] the entertainers at Club Utopia switched back to wearing "pasties" and bikini thongs.

The plaintiffs allege that the Registration Act imposes a constitutionally invalid prior restraint upon the exercise of their First Amendment rights. Mr. Friedman asserts that he is affected by the application of the Act in that he will be required to obtain a license to operate, and if he is denied such license, he will

---

[14]In letters dated May 30, 2000, sent to Messrs. Friedman and Prince, Mr. Henry states that "[t]he Giles County Sheriff's Department has conducted an investigation of your establishment pursuant to the Adult-Oriented Establishment Act of 1998 and has found potential and/or actual violations of the statute that could compromise your ability to do business." Clerk's resume (Docket Entry No. 40) hearing on preliminary injunction, attachment thereto, plaintiffs' exhibits 5 and 6. The potential violations were that there did not appear to be a clear line of vision into the theater in Mr. Friedman's bookstore and that the stage in Club Utopia was not six feet away from the patrons and there were areas for private dancing. The letters set a ten-day period for compliance and stated that the board would meet again after the ten-day period to determine if the establishments were in compliance with the Act and if further action would be warranted. Id.

[15]The July 6, 2000, letter reads in relevant part:

Please be advised that the Adult-Oriented Establishment Board will continue to monitor the operation of this business for compliance with the Act, however does not currently intend to take any compliance actions until resolution and outcome of the preliminary injunction hearing . . . .

This letter is for status purposes only and is not to be considered a binding opinion or decision of the Board, is subject to change and is for your informational use at this point only.

Id., plaintiffs' exhibit 7.

Case 1:00-cv-00065  Document 64  Filed 09/29/05  Page 9 of 51 PageID #: 76

have to cease operation of his bookstore. Mr. Prince asserts that he has been affected by the Registration Act in that the presentation of semi-nude dancing of an expressive nature protected by the First Amendment has been chilled or prohibited at Club Utopia. Specifically, the plaintiffs contend that: (1) the Registration Act fails to specify narrow, objective and definite standards in guiding the licensing board to decide whether to issue, renew or revoke a license; (2) the Act fails to place constitutionally adequate limits upon the time allowed for the board to make the initial determination as to whether a license shall issue; (3) the Act fails to ensure completion of the administrative review of an initial denial within a constitutionally permissible time period; (4) the Act fails to guarantee judicial review of a license denial whereby the reviewing court is required to address the merits of the administrative action; (5) the Act fails to ensure judicial review of administrative denials of a license which are merely erroneous, rather than "arbitrary or capricious"; and (6) the Act fails to preserve the status quo for existing businesses pending administrative and judicial review of the denial of a license application.

The plaintiffs also argue that: (1) the Act's criteria used in deciding whether to revoke or suspend a license is vague and/or overbroad; (2) the compulsory disclosure requirements of the Act

10

infringe upon the plaintiffs' right to privacy; (3) the Act violates the plaintiffs' right to privacy with regard to sexual activity and intimate association; (4) the fees for obtaining a license are excessive; and (5) the Act is unconstitutionally vague and/or overbroad as to which persons or entities are subject to the licensing requirements.

The defendants contend that the Registration Act is constitutional and assert that to the extent this Court finds any clause or provision to be unconstitutional the Court should give effect to the severability clause under the Tennessee Code and make an elision so as not to invalidate the entire act. The defendants also assert that the plaintiffs lack standing to bring this motion.

## II.

"Where the plaintiff establishes a constitutional violation after a trial on the merits, the plaintiff will be entitled to permanent injunctive relief upon showing 1) a continuing irreparable injury if the court fails to issue the injunction, and 2) the lack of an adequate remedy at law." Kallstrom v. City of Columbus, 136 F.3d 1055, 1067 (6th Cir. 1998).[16] Other relevant

---

[16]As stated previously, the parties agreed to forego a trial and let the Court decide the case based on the evidence presented in the record. Therefore, the legal standard to be applied is that for a permanent injunction, which incorporates the theory behind preliminary injunctive relief and the fact that the plaintiff must actually succeed on the merits. In considering whether or not to grant a preliminary injunction, courts are to consider four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the

11

factors are whether the granting of injunctive relief will substantially harm others and whether the public interest will be served by the injunctive relief. Markva v. Haveman, 168 F. Supp.2d 695, 718 (E.D. Mich. 2001). The decision to grant a permanent injunction is within the sound discretion of the district court. Kallstrom, 136 F.3d at 1067. Such injunctive relief should be no broader than necessary to remedy the harm at issue. Id. at 1069. The Supreme Court of the United States has stated that "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Connection Distrib., 154 F.3d at 288 (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2573, 2690, 49 L.Ed.2d 547, 565 (1976)(plurality) and citing Newsom v. Norris, 888 F.2d 371, 378 (6ᵗʰ Cir. 1989) for the proposition that "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.").

---

injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6ᵗʰ Cir. 1998)(quoting Golden v. Kelsey-Hayes Co., 73 F.3d 648, 653 (6ᵗʰ Cir. 1996), cert. denied, 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 12 (1996)). "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12, 107 S.Ct. 1396, 1404 n.12, 94 L.Ed.2d 542, 556 (1987).

III.

Sexually explicit, non-obscene performances and materials are expressions protected by the First Amendment to the United States Constitution. Young v. American Mini Theatres, Inc., 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310, 326 (1976). However, society is considered to have less interest in protecting this kind of expression than in protecting other kinds of speech. Id. Consequently, sexually explicit expression falls within the "outer perimeters of the First Amendment." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504, 511 (1991); see also Richland Bookmart, Inc. v. Nichols, 137 F.3d 435, 438 (6ᵗʰ Cir. 1998). Accordingly, the type of expression which the Registration Act seeks to regulate is on the "outer perimeters" of expression protected by the First Amendment. Id.

The level of scrutiny that courts apply in analyzing laws regulating such expression depends on the type of regulation at issue. Deja Vu of Nashville, Inc. v. Metropolitan Gov't of Nashville, 274 F.3d 377, 391 (6ᵗʰ Cir. 2001). If the regulation is "'content based,' that is, intended to impact speech," then courts apply strict scrutiny. Id. However, if the regulation is unrelated to the content of speech, courts apply an intermediate level of scrutiny. Id.

13

IV.

## A. STANDING

"The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603, 621 (1990) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569 (1984)). The party seeking to invoke jurisdiction must "'clearly . . . allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" Id., 493 U.S. at 231, 110 S.Ct. at 608, 107 L.Ed.2d at 622 (quoting Warth v. Seldin, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343, 366 (1975)). A party asserting standing must prove:

> (1) "injury in fact," by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury fairly can be traced to challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.

DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 414 (6th Cir. 1997) (citing G & V Lounge, Inc. v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1074 (6th Cir. 1994)).

14

> In the area of freedom of expression it is well
> established that one has standing to challenge a statute
> on the ground that it delegates overly broad licensing
> discretion to an administrative office, whether or not
> his conduct could be proscribed by a properly drawn
> statute, and whether or not he applied for a license.

Freedman v. Maryland, 380 U.S. 51, 56, 85 S.Ct. 734, 737,

13 L.Ed.2d 649, 653 (1965).

The plaintiffs have alleged several injuries-in-fact. They

first allege that the Registration Act is vague and/or overbroad[17]

and second, that it vests unbridled discretion in the licensing

board, resulting in a prior restraint of activities protected by

the First Amendment.

> [A] prior restraint constitutes a concrete and
> particularized actual injury in fact. It is well
> established that "when a licensing statute allegedly
> vests unbridled discretion in a government official over
> whether to permit or deny expressive activity, one who is
> subject to the law may challenge it facially without the
> necessity of first applying for, and being denied, a
> license." City of Lakewood v. Plain Dealer Publishing
> Co., 486 U.S. 750, 755, 108 S.Ct. 2138, 2143, 100 L.Ed.2d
> 771 (1988); see also Doran v. Salem Inn, 422 U.S. 922,
> 932-33, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975)
> (holding that it was firmly established that owners of
> topless bar had standing to challenge on the basis of
> overbreadth an ordinance banning topless dancing, even
> though they had not yet been prosecuted under the law);
> Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 89 S.Ct.
> 935, 938-39, 22 L.Ed.2d 162 (1969) ("The Constitution can
> hardly be thought to deny to one subjected to the
> restraints of [a licensing law] the right to attack its
> constitutionality, because he has not yielded to its
> demands.") . . . .

G & V Lounge, 23 F.3d at 1075.

---

[17]The plaintiffs' vagueness and overbreadth claims will be
discussed fully in part V. D. infra.

The plaintiffs also allege that the Registration Act (1) is constitutionally infirm in providing adequate administrative procedures with regard to the issuance or revocation of licenses, (2) fails to guarantee judicial review of a license denial and (3) fails to preserve the status quo for existing businesses pending administrative and judicial review of the denial of a license application resulting in a prior restraint of expression protected by the First Amendment. The plaintiffs further assert that the Act infringes upon the plaintiffs' right to privacy and intimate association and the fees for obtaining a license are excessive.

The defendants assert that the alleged harm to the plaintiffs is caused by their own inaction in not complying with the Registration Act in a timely manner or even timely challenging the validity of it.

Mr. Friedman applied for a license and permit within the 120-day grace period, albeit at the end of the period, and the status of his application at the time of the October 18, 2000, hearing had yet to be determined, and there is no evidence that he has received a license as of this date.[14] Mr. Prince has elected to operate Club

_____

[14]In DLS, the United States Court of Appeals for the Sixth Circuit held that the plaintiffs had no standing to challenge the license procedures because the plaintiffs already had a license and "[a]ny modification to the licensing scheme would have no effect on the potential threat that [the plaintiffs] face[d] under renewal or revocation proceedings."  Id., 107 F.3d at 413-14.  However, although the plaintiffs in this case have not been issued a license, they are still able to challenge the licensing procedures governing revocation, suspension and renewal because these

16

Utopia as an adult cabaret without a license.  Mr. Prince had previously required his dancers to wear full bikinis for fear that the board would shut him down for noncompliance with the Registration Act.

Mr. Friedman and Mr. Prince both received letters from the county attorney, Mr. Henry, in May and July, 2000.  The May letter mentioned potential violations in Expressway Books & Gifts and Club Utopia that threatened the continued operation of these businesses. The July letter stated that the Adult-Oriented Establishment Board would continue to monitor the operation of these businesses for compliance with the Registration Act but would not take any action until the issue of the preliminary injunction was resolved; however, in the letter, Mr. Henry stated that the board reserved the right to initiate compliance actions if it chose.  On September

---

procedures are basically the same as those governing the initial issuance of licenses and each license must be renewed each year. See Tenn. Code Ann. §§ 7-51-1104 to -1105, -1107, -1109 to -1111; see also Deja Vu of Nashville, 274 F.3d at 398-99 (distinguishing DLS).  Also, based on the record Mr. Friedman's application has not been ruled on, and if it has been accepted, then the renewal and revocation scheme would be applicable to him.

> [T]he fact that no revocation proceedings are currently pending is immaterial; just as a plaintiff need not go through the formality of submitting an application in a facially unconstitutional licensing scheme, so too a current license-holder "does not have to wait until his license is revoked to have standing to challenge the allegedly overbroad licensing scheme that would allow its revocation."

DLS, 107 F.3d at 414 (citations omitted).

28, 2001, the Giles County Adult-Oriented Establishment Board voted to begin enforcement of the Registration Act. In letters dated October 1, 2001, Messrs. Friedman and Prince were informed by Ms. Townsend of the board's decision and that the deadline for applying for licenses in compliance with the Act was November 6, 2001. Notice (filed October 9, 2001; Docket Entry No. 56) of filing supplemental facts, attachment thereto, exhibits (Docket Entry No. 57).

As is evidenced by the defendants' letters and the board's decision to begin enforcement of the Registration Act, there is a real threat that the board will shut down any businesses that are in noncompliance with the Registration Act. There have been potential violations cited by Mr. Henry in both Expressway Books & Gifts and Club Utopia, the status of Mr. Friedman's license application is unknown at the current time and if it has been approved he is still subject to the renewal procedures, Mr. Prince is currently operating Club Utopia as an adult cabaret without a license,[19] and Mr. Prince previously had his dancers perform wearing full bikinis for fear that they may be shut down for violating the Act.

---

[19]In Belew v. Giles County Adult-Oriented Bd., 1:01-0139, Mr. Prince testified that his dancers went back to wearing bikini tops and bottoms but then switched back in June, 2002, to wearing pasties and a thong.

18

Therefore, the plaintiffs have a reasonable belief that the defendants will enforce the Registration Act against them. G & V Lounge, 23 F.3d 1075-76 ("[T]he threat to take away Plaintiff's license or permit has already chilled Plaintiff from presenting a First Amendment protected activity to the public."); see also Entertainment Concepts, Inc., III v. Maciejewski, 631 F.2d 497, 500 (7th Cir. 1980) (stating that even though the village board did not specifically threaten the plaintiff with prosecution, the board's conduct indicated more than a broad policy that it would enforce the laws generally:

> Plaintiff can reasonably assert that it fears enforcement of these two ordinances for specific conduct on its part. "Under such circumstances, this Court does not feel it 'necessary that (plaintiff) first expose himself to actual arrest or prosecution to be entitled to challenge a statute he claims deters the exercise of his constitutional rights.'"

Id. (citation omitted)); City of Houston v. Hill, 482 U.S. 451, 459 n.7, 107 S.Ct. 2502, 2508 n.7, 96 L.Ed.2d 398, 410 n.7 (1987) (plaintiff had standing to seek prospective relief where he had shown a "genuine threat of enforcement" of the ordinance in question).

The plaintiffs have further alleged that the Registration Act operates as a prior restraint on activities protected by the First Amendment. As the Sixth Circuit stated in G & V Lounge, 23 F.3d 1075-76, a "prior restraint constitutes a concrete and particularized actual injury in fact." The threat of the

19

defendants denying the plaintiffs licenses and/or initiating proceedings for noncompliance with the Act is actual and imminent. Giles County has adopted the Act, and, as the Court has explained above, the plaintiffs do not need to apply for licenses in order to challenge the constitutionality of the Act. Further, the County's alleged prior restraint is directly traceable to the Act, and it is redressable by a favorable decision for the plaintiffs. Accordingly, based on the above, the Court finds that the plaintiffs have standing to contest the constitutionality of the Registration Act. Freedman, 380 U.S. at 56, 85 S.Ct. at 737, 13 L.Ed.2d at 653; City of Lakewood, 486 U.S. at 755, 108 S.Ct. at 2143, 100 L.Ed.2d at 781-82; G & V Lounge, 23 F.3d 1075-76.

## B. PRIOR RESTRAINT

The plaintiffs challenge that the Registration Act operates as an impermissible prior restraint on protected expression. They argue that the licensing scheme established by the Act vests unbridled discretion in the board in deciding whether to issue, deny, renew or revoke a license. The plaintiffs contend that although the Act does specify some disqualifying factors regarding the issuance of licenses, there is nothing in the Act that mandates that these factors are the exclusive criteria employed in denying or revoking licenses.

A "prior restraint" exists when speech is conditioned upon the prior approval of public officials. Nightclubs, Inc. v. City of

20

<u>Paducah</u>, 202 F.3d 884, 889 (6th Cir. 2000); <u>BJS No. 2, Inc. v. City</u> <u>of Troy, Ohio</u>, 87 F. Supp.2d 800, 809-10 (S.D. Ohio 1999) ("[A]n ordinance that imposes upon a proprietor the burden of obtaining a permit in order to engage in constitutionally protected activity is properly analyzed as a prior restraint."). Although laws may validly prohibit certain types of expression not protected by the First Amendment, a prior restraint on the exercise of First Amendment rights is "the most serious and least tolerable infringement on First Amendment rights." <u>Nebraska Press Ass'n v.</u> <u>Stewart</u>, 427 U.S. 539, 559, 96 S.Ct. 2781, 2803, 49 L.Ed.2d 683, 697 (1975).

> Prior restraints are presumptively invalid because they typically involve "two evils that will not be tolerated": (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) "the risk of indefinitely suppressing permissible speech" when a licensing law fails to provide for the prompt issuance of a license.

<u>Nightclubs</u>, 202 F.3d at 889 (quoting <u>FW/PBS</u>, 493 U.S. at 225-27, 110 S.Ct. at 604-05, 107 L.Ed.2d at 618-19); <u>see</u> <u>FW/PBS</u>, 493 U.S. at 226, 110 S.Ct. at 605, 107 L.Ed.2d at 618 ("'[A]n ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official--as by requiring a permit or license which may be granted or withheld in the discretion of such official--is an unconstitutional censorship or prior restraint . . . .'") (citations omitted). "A licensing system need not effect total

21

suppression in order to create a prior restraint." Southeastern
Promotions, Ltd. v. Conrad, 402 U.S. 546, 557 n.8, 95 S.Ct. 1239,
1245 n.8, 43 L.Ed.2d 448, 458 n.8 (1975).

Accordingly, "'[a]ny system of prior restraints of expression
[bears] a heavy presumption against its constitutional validity.'"
Vance v. Universal Amusement Co., Inc., 445 U.S. 308, 317,
100 S.Ct. 1156, 1162, 63 L.Ed.2d 413, 421 (1980)(quoting Bantam
Books, 372 U.S. at 70, 83 S.Ct. at 639, 9 L.Ed.2d. at 593 (emphasis
in original)(citations omitted)). Prior restraints against
expression protected by the First Amendment are disfavored because
"[i]t is difficult to know in advance what an individual will say,
and the line between legitimate and illegitimate speech is often so
finely drawn that the risks of freewheeling censorship are
formidable." Vance, 445 U.S. at 315 n.13, 100 S.Ct. at 1161 n.13,
63 L.Ed.2d at 420 n.13 (citations omitted).

In order to avoid constitutional infirmity on protected
expression, a licensing scheme "must remove discretion from
government officials" and provide certain procedural safeguards.
J. L. Spoons, Inc. v. City of Brunswick, 49 F. Supp.2d 1032, 1038
(N.D. Ohio 1999); FW/PBS, 493 U.S. at 225-26, 110 S.Ct. at 605,
107 L.Ed.2d at 618; Southeastern Promotions, 402 U.S. at 559,
95 S.Ct. at 1247, 43 L.Ed.2d at 459. In Freedman supra, the
Supreme Court invalidated a Maryland motion picture censorship
statute under the First Amendment because the statute did not

22

provide the necessary procedural safeguards in protecting against governmental infringement on protected expression. Freedman, 380 U.S. at 58-60, 85 S.Ct. at 738-40, 13 L.Ed.2d at 654-55. The Court determined that the following three procedural safeguards are required to avoid constitutional infirmity:

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

FW/PBS, 493 U.S. at 227, 110 S.Ct. at 606, 107 L.Ed.2d at 619 (citing Freedman, 380 U.S. at 58-60, 85 S.Ct. at 738-740, 13 L.Ed.2d at 654-55).

In FW/PBS, the Supreme Court applied Freedman to a Dallas, Texas, ordinance which required sexually oriented businesses to pass certain municipal inspections before they could obtain their mandatory licenses. However, in a plurality opinion, Justice O'Connor, joined by Justices Stevens and Kennedy, found that the Dallas licensing scheme did not present "the grave 'dangers of a censorship system'" as found in Freedman and concluded that not all three procedural safeguards were required. FW/PBS, 493 U.S. at 228, 110 S.Ct. at 606, 107 L.Ed.2d at 620. The plurality stated:

> The core policy underlying Freedman is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential:

23

the licensor must make the decision whether to issue the
license within a specified and reasonable time period
during which the status quo is maintained, and there must
be the possibility of prompt judicial review in the event
that the license is erroneously denied.

Id.

The plurality concluded that the third Freedman procedural
safeguard--that the censor must bear the burden of going to court
to suppress the speech and must bear the burden of proof once in
court--is inapplicable where a scheme does not require a public
official to "engage in direct censorship of particular expressive
material." Id., 493 U.S. at 229, 110 S.Ct. at 606-07, 107 L.Ed.2d
at 620. The plurality distinguished the Dallas licensing scheme
from the censorship scheme in Freedman by stating that the City of
Dallas did not "exercise discretion by passing judgment on the
content of any protected speech," and, instead, the city just
reviewed the general qualifications of each applicant, "a
ministerial action that is not presumptively invalid." Id.,
493 U.S. at 229, 110 S.Ct. at 607, 107 L.Ed.2d at 621. In a
concurring opinion, Justice Brennan, joined by Justices Marshall
and Blackmun, opined that all three of the procedural safeguards
articulated in Freedman must be applied to any system of prior
restraint. Id., 493 U.S. at 239, 110 S.Ct. at 611-12, 107 L.Ed.2d
at 626-27. (Brennan, J., concurring).

In analyzing Freedman and FW/PBS, the Sixth Circuit has
stated:

24

> Although the status of the third <u>Freedman</u> requirement
> remains unclear in the licensing context, this Circuit
> has previously noted that, under <u>FW/PBS</u>, at least the
> first two <u>Freedman</u> safeguards are essential for a
> licensing scheme to comport with the First Amendment.
> <u>See East Brooks Books, Inc. v. City of Memphis</u>, 48 F.3d
> 220, 224 (6th Cir. 1995)(invalidating Memphis, Tennessee
> sexually oriented business ordinance that failed to
> ensure prompt judicial review). Thus, a licensing scheme
> must remove standardless discretion from government
> officials and contain two procedural safeguards: (1) the
> decision whether to issue a license must be made within
> a specified brief period, and the status quo must be
> maintained during that period and during judicial review,
> and (2) there must be a "guarantee of prompt judicial
> review."

<u>Nightclubs</u>, 202 F.3d at 890 (citation omitted); <u>Deja Vu of Nashville</u>, 274 F.3d 401 n.5; <u>Odle v. Decatur County</u>, 421 F.3d 386, 390 (6th Cir. 2005).[20]

### 1. lack of narrow, objective standards governing the issuance and renewal of licenses

The plaintiffs contend that the Registration Act fails to specify narrow, objective and definite standards in guiding the licensing board in determining whether to issue a license, and if issued, whether or not it will be renewed. They admit that the Act provides some disqualifying criteria regarding the issuance of licenses; however, they contend that there is nothing in the Act

---

[20]In this case, the Court does not need to address whether or not the third <u>Freedman</u> requirement should be included in the Registration Act. Sections 7-51-1109(c), (f) and -1110(c), (e) of the Act require the county attorney to institute suit for declaratory judgment if the board affirms the denial, suspension or revocation of an applicant's license or permit and prove that such action by the board was not arbitrary or capricious.

which mandates that the criteria specified in the Act be the exclusive bases for denying an applicant a license.[21]

The plaintiffs contend that the only safeguards provided by the Registration Act with regard to the substantive criteria used in governing the issuance and renewal of licenses are that an unsuccessful applicant is to be notified in writing of the reasons for the denial, that upon denial the applicant may request a hearing before the board, and if the board affirms such denial, the board has the burden of proving before a court that its denial of the license was not arbitrary or capricious. Tenn. Code Ann. § 7-51-1110(b)-(e). They argue that these provisions, read in context of the entire statutory scheme, grant the board discretion to deny

---

[21]To qualify for a license, an applicant must, inter alia, provide his or her name and address, including any aliases, be at least eighteen years of age, provide information regarding any business association with an adult-oriented business within the last five years, the adult-oriented business license history of the applicant and whether such license had been revoked or suspended, the address where the adult-oriented business is to be operated, a statement of familiarity and compliance with the Act, and proof that the applicant has satisfied the applicable zoning requirements. Tenn. Code Ann. §§ 7-51-1105, -1104(f). An applicant is also disqualified from receiving a license if the applicant has had a license revoked within the last five years. Id., § 7-51-1106(1)(B). Further, an applicant is disqualified from receiving a license if he or she has been convicted of any "specified criminal acts" as defined in § 7-51-1102(25) (2003) within the last two to five years, depending if the crime was a misdemeanor or felony, and if the applicant fails or refuses to provide relevant information regarding the investigation of the application, fails or refuses to appear at any reasonable time or place for examination under oath, or fails or refuses to cooperate with any investigation concerning the application. Id., §§ 7-51-1105(d), -1117(a)(3).

26

an applicant a license for any subjective reason, as long as it is not considered to be arbitrary or capricious.[22] They assert that the lack of any mandatory language in the Act requiring the board to issue or renew a license unless it affirmatively finds that an applicant failed to meet specific, objective and definite standards authorizes unconstitutional content discrimination.

Contrary to the plaintiffs' assertions, the Court finds that the Registration Act does not vest unbridled discretion in the board, it sets forth specific and objective criteria to be used in determining the initial issuance and renewal of licenses, and the board's function is a ministerial action which does not allow it to "exercise discretion by passing judgment on the content of [the] protected speech." FW/PBS, 493 U.S. at 229, 110 S.Ct. at 607, 107 L.Ed.2d at 621; DLS, 107 F.3d at 414. Although the Act does not state that the criteria specified in the Act be the exclusive bases for denying an applicant a license,[23] the provisions clearly

---

[22]The Court will address the issue of the board having to show that its denial of a license was not arbitrary or capricious pursuant to Tenn. Code Ann. § 7-51-1110(e), later in this memorandum.

[23]The Court notes that, as amended, Tenn. Code Ann. § 7-51-1106(4) (2001) states, "The board shall only deny an application for a license for reasons set forth in this part." However, this provision is contradicted by § 7-51-1103(h) (2001) which grants the board authority "to promulgate procedural rules and any substantive rules" with regard to the board's discretion in granting, denying, revoking or suspending a license.

27

state objective reasons for disqualifying an applicant from obtaining a license.

The plaintiffs also complain that the Registration Act allows for local governmental units to impose additional requirements which an applicant must satisfy in order to obtain a license. The plaintiffs contend that Tenn. Code Ann. § 7-51-1121(a), read in conjunction with § 7-51-1109(a)(2), provides no limitations on the breadth and scope of the rules or regulations which may be adopted by the board.

In response, the defendants contend that the ability of political subdivisions to enact other regulations, in addition to those provided by the Registration Act, does not render the Act unconstitutional on its face nor does the fact that political subdivisions may enact their own regulations somehow grant the board unbridled discretion under § 7-51-1109(a)(2). They contend that § 7-51-1121(a) only allows for political subdivisions to enact other regulations and it does not specifically incorporate those regulations into the Act as bases for denying licenses.[24]

Section 7-51-1121(a) grants local political subdivisions the authority to enact and enforce their own regulations relating to adult-oriented businesses. There is nothing in §§ 7-51-1121(a) and

---

[24]However, the defendants concede that the zoning rules, regulations and provisions of the county are specifically incorporated in the Act as bases for denying licenses. See Tenn. Code Ann. § 7-51-1104(f).

28

7-51-1109(a)(2) which suggests that any of the regulations passed by a political subdivision are to be used by the board in determining whether to issue licenses. In fact, § 7-51-1121(b) states that:

Notwithstanding any provision of subsection (a) or any other law to the contrary, if a city or other political subdivision in this state chooses to enact and enforce its own regulatory scheme for adult-oriented establishments and sexually-oriented businesses, then the provisions of this part, shall not apply within the jurisdiction of such city or other political subdivision.

According to this provision, the decision will be up to the local governmental unit, not the adult-oriented establishment board, to enforce the regulations which it enacts. Further, § 7-51-1121(a), which was amended in 2001, now includes the following: "Except as specified in this part, such other lawful and reasonable restrictions, regulations, licensing, and other criminal, civil, or administrative provisions shall not be a basis for the board's denying, revoking, or suspending a license or permit under this part."

However, the plaintiffs assert that § 7-51-1109(a)(2) authorizes the board to adopt other regulations that may be used in determining whether to grant or deny applications. They argue that § 7-51-1109(a)(2) mandates the board to revoke, suspend or annul any license if an "operator or entertainer, or any employee of the operator, violates any provision of this part <u>or any rule or regulation adopted by the board pursuant to this part</u>." (Emphasis

29

added).  The defendants respond by arguing that the board is not vested with unbridled discretion simply because it is given authority to make rules and regulations.[25]  They assert that unless such rules and regulations are constitutionally infirm, those rules and regulations would qualify as specific disqualifying criteria for the board to follow in determining whether to grant or deny a particular application.  The defendants argue that if the board were to adopt a rule or regulation which was found to be unconstitutional, then the appropriate remedy would be to declare that particular rule or regulation invalid.

The Court agrees with the plaintiffs that § 7-51-1109(a)(2) appears to indicate that the board has the authority to adopt other rules and regulations, in addition to those established by the Registration Act.[26]  However, there is no evidence in the record that the Giles County Adult-Oriented Establishment Board has adopted any other rules or regulations besides those specifically provided in the Act.  Therefore, the plaintiffs do not have

---

[25]Tennessee Code Ann. § 7-51-1103(h), as amended in 2001, states:

> To further the purposes of this part, the board shall have authority to promulgate procedural rules and any substantive rules consistent with this part that are constitutionally valid and are promulgated in such a way that the board's discretion about whether to grant, deny, revoke, or suspend a license or permit is not unbridled.

[26]As stated in footnote 23 supra, § 7-51-1103(h) (2001) also provides the board with the authority to promulgate any substantive rules in granting, denying, revoking, or suspending a license.

Case 1:00-cv-00065  Document 64  Filed 09/29/05  Page 30 of 51 PageID #: 97

standing to contest this provision of the Registration Act because there is not an "injury in fact" that is concrete and particularized and actual or imminent. DLS, 107 F.3d at 414. The plaintiffs only allege a possible injury that is merely conjectural and hypothetical. Accordingly, the plaintiffs do not have standing to challenge the constitutionality of the above provision as granting the board unbridled discretion in determining whether or not to issue licenses.

*2. failure to provide sufficient procedural safeguards*

The plaintiffs contend that the Registration Act fails to set adequate procedural protections as required by Freedman. Specifically, they contend that the Act fails to require that the board will act upon a license application within a reasonable period of time, during which the status quo is maintained or, in the case of existing businesses, issue temporary licenses. Also, they contend that the Act does not stay the board's decision denying an application for a license, pending judicial review. The defendants contend that the Act does provide specific and reasonable time frames within which the board is to act and within which prompt judicial review is ensured. The Court will briefly describe the provisions of the Act that provide the bases of the plaintiffs' particular claims.

The Registration Act provides that a license shall not be issued unless the board or sheriff's department has conducted an

31

investigation into the applicant's qualifications. Tenn. Code Ann. § 7-51-1106(4). The results of the investigation are to be filed in writing with the board no later than twenty days after the date of the application for a license. Id. Within ten days of receiving the results of the investigation, the board is required to notify the applicant as to whether or not the application is granted, denied or being held for further investigation. Tenn. Code Ann. § 7-51-1105(c). If further investigation is needed, it is not to exceed thirty days, unless the applicant agrees otherwise. Id. Once the investigation is concluded, the board is required to advise the applicant in writing whether the application is granted or denied. Id. This initial investigative and review process allows the board a maximum of sixty days to lapse before making an initial ruling on a license application.

If the board denies an application, the chair is to notify the applicant in writing of the reasons for the denial and to advise the applicant that the applicant has the right to request a hearing before the board. Tenn. Code Ann. § 7-51-1110(b) (2003). The applicant must make such a request in writing to the county mayor within ten days of the applicant receiving the notification of denial. Id. Upon a timely request by the applicant, a public hearing will be held within 15 days of the county mayor's receipt of the applicant's request. At the hearing, the board is to hear evidence concerning the denial of the application and will either

32

affirm or reverse the board's prior ruling at the conclusion of the hearing. The hearing shall be concluded no later than 22 days from the date of the applicant's initial receipt of the notification of denial, unless the applicant requests an extension beyond this time period that is granted by the board. Id.

The plaintiffs submit that if the board takes the maximum time allowed by the Registration Act in the entire administrative process and assuming that the notification of the board's initial denial takes a day or two to be delivered by mail, the Act allows for at least 83 or 84 days to lapse between the submission of a license application and the conclusion of the administrative hearing.[27],[28] They contend that this period of time to complete the administrative process constitutes an unconstitutional delay in violation of the Supreme Court's holding in Freedman, supra. In support, the plaintiffs rely on Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968) and United States v.

---

[27]The Registration Act also provides that if the board affirms the denial of an application, the county attorney shall institute suit for declaratory judgment in a court of record in the county, within five days of the board's affirmation. The applicant is then entitled to judicial determination of the issues within two days after joinder of issue, and a decision will be rendered by the court within two days of the conclusion of the hearing. Tenn. Code Ann. § 7-51-1110(c), (d).

[28]Tennessee Coded Annotated § 7-51-1109(b)(1)-(3), (c), (e) imposes the same time limits for an applicant to appeal the board's initial decision to revoke or suspend a license and for the county attorney to seek judicial determination of the board's affirmation of denial regarding the revocation or suspension of a license.

33

Thirty-Seven (37) Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

In Teitel, the Supreme Court held that a motion picture ordinance, which allowed 50 to 57 days to elapse during the administrative stage before the initiation of judicial proceedings, was unconstitutional. Id. The ordinance required an exhibitor of a film to submit such a film first to a censor before obtaining a permit to exhibit the film. Id., 390 U.S. at 140, 88 S.Ct. at 755, 19 L.Ed.2d at 968. The ordinance allowed the exhibitor to appeal a denial by the censor to an appeals board, and if the appeals board upheld the censor's decision, then the exhibitor was entitled to a hearing before the board. Id. If the appeals board ruled against the exhibitor, then the board was to file in court an action for injunction against the showing of the film. However, there was no statutory provision assuring that a prompt judicial decision would follow. Id., 390 U.S. at 140-41, 88 S.Ct. at 755, 19 L.Ed.2d at 969. The Supreme Court, relying on its decision in Freedman, found that the ordinance was unconstitutional in two respects:

> (1) The 50 to 57 days provided by the ordinance to complete the administrative process before initiation of the judicial proceeding does not satisfy the standard that the procedure must assure "that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film." (2) The absence of any provision for a prompt judicial decision by the trial court violates the standard that "the procedure must also assure a prompt final judicial decision . . . ."

34

Id., 390 U.S. at 141-42, 88 S.Ct. at 756, 19 L.Ed.2d at 969 (citation omitted).

Teitel, however, can be distinguished from the case at bar. In Teitel, the ordinance was content-based and provided for a censorship scheme as opposed to a licensing scheme, a difference the Supreme Court emphasized in FW/PBS.[29]   See also City of Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774, 784, 124 S.Ct. 2219, 2226, 159 L.Ed.2d 84, 94 (2004) ("Where . . . the regulation simply conditions the operation of an adult business on compliance with neutral and nondiscretionary criteria . . . and does not seek to censor content, an adult business is not entitled to an unusually speedy judicial decision of the Freedman type.").

Thirty-Seven (37) Photographs involved United States customs agents seizing 37 photographs for being obscene.   The federal statute in question did not provide for explicit time limits as required by Freedman.   In order to uphold the constitutionality of the statute, the Court examined the legislative history of the statute, forty years worth of cases sanctioning delays from 40 days to six months between the seizure of the obscene goods to the

---

[29]Unlike the ordinance in Teitel, the Registration Act also provides a specified time frame in which the board is to seek a declaratory judgment before a court which is to render its decision within two days of the conclusion of the hearing.   See Tenn. Code Ann. §§ 7-51-1109(c), (e), -1110(c), (d).   Because the plaintiffs challenge the fact that judicial review is severely limited by the means of a declaratory judgment, the Court will fully address this issue infra.

commencement of judicial proceedings, cases where the completion of judicial proceedings took as long as three to seven months, and cases in the lower federal courts in which proceedings were brought under the challenged act. Thirty-Seven (37) Photographs, 402 U.S. at 371-373, 91 S.Ct. at 1406, 28 L.Ed.2d at 831-32. The Court construed the statute to require intervals of no more than 14 days from the seizure of the goods to the institution of judicial proceedings for their forfeiture and no longer than 60 days from the filing of the action to a final decision in the district court. Id., 402 U.S. at 373-74, 91 S.Ct. at 1407, 28 L.Ed.2d at 832. The Court reasoned that a possible delay of as much as 74 days did not seem to be an undue burden for importers engaged in the lengthy process of bringing goods into the United States. Id.

Like Teitel, Thirty-Seven (37) Photographs can be distinguished from the instant case. Thirty-Seven (37) Photographs involved a censorship scheme that authorized the forfeiture of alleged obscene materials. As discussed previously, the Registration Act is a licensing scheme and does not provide for the seizure of any materials in violation of the Act.

The Court finds that the Registration Act does provide for a reasonable and definite time in which a decision must be made. Although the plaintiffs contend that the administrative process could take up to 84 days before receiving prompt judicial review, the Court believes such occurrences would be the rare exception and

36

not the rule. In East Brooks Books, the Sixth Circuit was concerned with the Memphis ordinance because three to five months could possibly lapse after the administrative process before an applicant received judicial review. 48 F.3d at 225. The Court noted that although the Supreme Court had not expressly defined prompt judicial review, it believed that potential delays of over five months were impermissible. Id. The Registration Act does not suffer from such an infirmity, for it provides deadlines for the initiation of an action for declaratory judgment and judicial determination after joinder of issue.

The plaintiffs further assert that the delay in the administrative process is exacerbated by the general rule in Tennessee that statutory provisions relating to the time of doing an act in which a statute applies are directory rather than mandatory.

> In general, when determining whether a procedural requirement of a statute is directory or mandatory, the object is to ascertain the legislative intent by consideration of the entire statute, including its nature and purpose, and the consequences that would result from a construction one way or the other. Directory provisions require only substantial compliance. Statutory provisions relating to the mode or time of doing an act to which the statute applies are ordinarily held to be directory rather than mandatory.

Presley v. Bennett, 860 S.W.2d 857, 860 (Tenn. 1993) (citations omitted).

The plaintiffs contend that this general rule conflicts with the constitutional imperative that a licensing scheme must

reasonably ensure a prompt judicial determination, and not mere access to judicial review. Nightclubs, 202 F.3d at 892.

As stated in Pressley, in determining whether a procedural requirement is directory or mandatory, a court must look at the legislative intent by considering the entire statute and its purpose. In Stiner v. Powells Valley Hardware, Co., 75 S.W.2d 406 (Tenn. 1934), the Tennessee supreme court had to decide whether certain statutes were directory or mandatory. In that case, the act provided that if the chancellor did not file his findings expeditiously, an application would be made to him to make such findings before the record was certified. Id. at 407. In making its determination on whether the act was directory or mandatory, the court examined the legislature's objective in passing the particular statutes and found that the legislature's intent was to lighten the work of the appellate courts by eliminating all questions of fact found by the chancellor that were not challenged on appeal and to make concurrent the findings of fact by the chancellor and the court of appeals conclusive. Id.

The court concluded that if either the chancellor or the court of appeals refused to find facts, the statutes would then be construed as being directory, thus, rendering them useless and defeating the objective of the legislature. Id. at 408. The court stated that:

> requirements in a statute which are of the very essence
> of the thing to be done, and the ignoring of which would

38

practically nullify the vital purpose of the statute itself, are regarded by the courts as mandatory and imperative. Here the findings of fact by the chancellor and the incorporation thereof into the record are the essential things which the statutes require, and this is not a mere matter of convenience but is one of substance. Primarily, the words "shall" and "must" appearing in the Public Acts of 1925 are imperative.

Id., (citations and internal quotes omitted); see also Pressley, 860 S.W.2d at 860-61 (in finding that a statute was directory, the court looked at the intent of the legislature in passing the Worker's Compensation Act and found that the intent of the act was to protect workers and their families from economic devastation and to ensure that injured workers were justly and appropriately reimbursed for their injuries).

As part of the record, the defendants have submitted the transcribed legislative history of the Registration Act. See notice (filed August 10, 2000; Docket Entry No. 23) of filing of legislative history. The legislative history reveals that there was discussion regarding the case law behind adult entertainment regulation as well as the Chattanooga City Ordinance regulating such activity, which had been upheld by the Sixth Circuit in DLS, 107 F.3d 403. During the state senate judiciary committee meeting conducted on March 17, 1998, Mr. Phil Noblett, an assistant attorney with the city attorney's office for Chattanooga, stated that he had been involved in adult bookstore litigation for nearly 15 years. Id. at 2. Mr. Noblett stated that the proposed Registration Act was patterned on the Chattanooga City Ordinance

39

which had been upheld by the Sixth Circuit and, thus, the Chattanooga ordinance provided a model for regulating adult entertainment establishments on a state level. Id.

Further perusal of the legislative history of the Registration Act also reveals that there were several references made regarding the constitutionality of the Chattanooga ordinance being upheld, that there was concern over the fact that different forms of adult entertainment were now in existence, which were not prevalent back in the 1980's, and references were made to cases dealing with adult entertainment regulations such as Young v. American Mini Theatres, supra, Barnes v. Glen Theatre, supra, FW/PBS, supra, City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) and Broadway Books, Inc. v. Roberts, 642 F. Supp. 486 (E.D. Tenn. 1986). Id. at 4, 6, 10, 14, 17-19, 22, 42. Moreover, on May 1, 1998, during debate on the senate floor, Senator Jordan stated, "I was comfortable with the bill we passed out of the Senate based on rulings by the Sixth Circuit Court of Appeals, U.S. Supreme Court, and the Ninth Circuit Court of Appeals, among others." Id. at 45.

The above legislative history reveals that, when deciding to enact the Registration Act, members of the legislature were aware of prior case law and the various regulations which had been passed in an attempt to regulate the different facets of adult-oriented establishments. The language used in the Registration Act also

40

tracks much of the language used in the Chattanooga City Ordinance. Clearly, the intent of the legislature was to address the concerns associated with adult-oriented businesses, and it took into consideration prior case law in formulating a law which it believed would conform to the edicts handed down in Freedman and FW/PBS.

As has been stated previously, at least the first two Freedman procedural safeguards are mandatory in a licensing scheme, and any act attempting to regulate adult-oriented businesses must have these mechanisms in place in order to survive constitutional review. Sections 7-51-1109 and -1110 of the Registration Act set forth the Freedman procedural safeguards relating to the administrative and judicial review process. Throughout those provisions, the word "shall" is repeatedly used, leaving no ambiguity as to the legislature's intent that those provisions were to be mandatorily applied in accordance with the directive laid down in Freedman and accompanying case law.

Accordingly, the Court finds that the statutory provisions relating to the administrative and judicial process are mandatory and not directory.

Next, the plaintiffs contend that, although the Registration Act does provide for the possibility of judicial review in the event that an application for a license is denied, revoked or suspended, the review is severely limited. Specifically, the plaintiffs allege that (1) the Act allows a state court judge

41

discretion as to whether to entertain an action for judicial review of the board's decision in violation of the requirements laid down in Freedman and FW/PBS, (2) the Act fails to provide for review of "erroneous" determinations by the licensing board and (3) the Act fails to provide for any stay of the board's decision to deny, revoke or suspend an application pending judicial review.

a. declaratory judgment[30]

The plaintiffs assert that the only provision in the Registration Act which provides an avenue for judicial review is by way of declaratory judgment.[31]  They contend that according to

---

[30]Tenn. Code Ann. § 29-14-103 provides:

Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.

[31]Tenn. Code Ann. § 7-51-1109 provides in pertinent part:

(c) If the board affirms the suspension or revocation, the county attorney for such county shall institute suit for declaratory judgment in a court of record in such county, within five (5) days of the date of any such affirmation seeking an immediate judicial determination of whether such license or permit has been properly revoked or suspended under the law.

. . . .

(e) The applicant shall be entitled to judicial determination of the issues within two (2) days after joinder of issue, and a decision shall be rendered by the

42

Tennessee law a trial court has broad discretion in deciding whether to decline to issue a declaratory judgment and the Act, therefore, fails to ensure a judicial determination in the event that the board renders an adverse decision against an applicant.

The defendants admit that, based on the general law of Tennessee, a state trial court's power to entertain a declaratory judgment or render a declaratory order is normally discretionary. However, they argue that under the rules of statutory construction in Tennessee specific statutory provisions control over more general provisions.

"The trial court's discretion in refusing a declaration is 'very wide,' and will not be disturbed on appeal unless the trial judge has acted arbitrarily." State ex rel. Earhart v. City of Bristol, 970 S.W.2d 948, 954 (Tenn. 1998) (citing Sandard Accident

---

court within two (2) days of the conclusion of the hearing.

Tenn. Code Ann. § 7-51-1110 (2001) provides in pertinent part:

(c) If the board affirms the denial of an application, the office of the county attorney for such county shall institute suit for declaratory judgment in a court of record in such county, within five (5) days of the date of any such denial seeking an immediate judicial determination of whether such application has been properly denied under the law.

(d) The applicant shall be entitled to judicial determination of the issues within two (2) days after joinder of issue, and a decision shall be rendered by the court within two (2) days of the conclusion of the hearing. . . .

Case 1:00-cv-00065   Document 64   Filed 09/29/05   Page 43 of 51   PageID #: 110

Ins. Co. v. Carvin, 217 Tenn. 662, 666, 400 S.W.2d 235, 236 (Tenn. 1966) and Southern Fire and Cas. Co. v. Cooper, 200 Tenn. 283, 286, 292 S.W.2d 177, 178 (Tenn. 1956)). "[A] declaratory judgment may properly be refused if it can be made only after a judicial investigation of disputed facts." Carvin, 217 Tenn. at 666, 400 S.W.2d at 236 (quoting Newsum v. Interstate Realty Co., 152 Tenn. 302, 305, 278 S.W. 56, 57 (Tenn. 1925)). However, the Tennessee supreme court has stated, "We are of opinion that the act should be liberally construed in favor of the person seeking relief in a proper case to the end that rights and interests be expeditiously determined." Tennessee Farmers Mut. Ins. Co. v. Hammond, 200 Tenn. 106, 111, 290 S.W.2d 860, 862 (Tenn. 1956); Shelby County Bd. of Comm'rs v. Shelby County Quarterly Court, 216 Tenn. 470, 482, 392 S.W.2d 935, 941 (Tenn. 1965); Bedford County Hosp. v. County of Bedford, 42 Tenn. App. 569, 578, 304 S.W.2d 697, 701 (Tenn. Ct. App. 1957) ("[T]he Declaratory judgment law must be liberally construed to effect its purpose, that is, to finally decree the rights of the parties and to give them the relief to which they are entitled.").

In construing statutes, the Tennessee supreme court has stated:

> This Court's role in construing a statute is to determine and to "give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). We must determine the legislative intent from the plain language of the statute, "read in

context of the entire statute, without any forced or subtle construction which would extend or limit its meaning." State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997). As a matter of statutory construction, a specific statutory provision will control over a more general statutory provision. Matter of Harris, 849 S.W.2d 334, 337 (Tenn. 1993).

State v. Cauthern, 967 S.W.2d 726, 735 (Tenn. 1998).

In examining the Registration Act, the Court notes that the Act uses mandatory language, instructing the county attorney to initiate suit for declaratory judgment for a judicial determination of whether an application has been properly denied, revoked or suspended by the board under the law. The Act further states that the applicant "shall be entitled to judicial determination of the issues" and that "a decision shall be rendered by the court within two days of the conclusion of the hearing." See Tenn. Code Ann. §§ 7-51-1109(c), (e), -1110(c), (d) (emphasis added). The statute clearly mandates that a court is to entertain an action for a declaratory judgment, thus, removing the court's discretion in the matter. Further, §§ 7-51-1109, -1110, read in context with the entire Act, reveal the legislative intent in fastening together a regulation which would comport with the constitutional requirements pronounced by the Supreme Court of the United States in regulating adult-oriented businesses. Moreover, § 7-51-1110 was amended in 2001 by the addition of subsection (f) which specifically mandates: "The provisions of this part mandating judicial review shall

45

control over general provisions for declaratory judgment actions in the event of any conflict."

The Court finds that the Registration Act mandates that a state trial court entertain an action for declaratory judgment in accordance with that Act and therefore ensures a judicial determination in the event the board renders an adverse decision against an applicant. It is presumed "that courts are aware of the constitutional need to avoid 'undue delay result[ing] in the unconstitutional suppression of protected speech.'" City of Littleton, 541 U.S. at 782, 124 S.Ct. at 2225, 159 L.Ed.2d at 93; see also Odle, 421 F.3d at 390-91. Accordingly, the plaintiffs contention fails.

### b. arbitrary or capricious standard

The plaintiffs contend that the "arbitrary or capricious" standard of review employed by Tenn. Code Ann. §§ 7-51-1109(f), -1110(e) effectively precludes a court from reviewing the correctness of the board's factual determinations.[32] In Tennessee, the "arbitrary or capricious" standard of review allows reviewing courts to give much deference to the broad discretionary powers of local governmental bodies, and judicial review is thereby limited

---

[32]Tennessee Code Ann. §§ 7-51-1109(f), -1110(e) (2001) state that the board shall have the burden of showing that a denial, revocation or suspension of a license was not arbitrary or capricious and that if a decision by the board is found to be clearly erroneous, the court may overturn the decision as being arbitrary or capricious.

46

in scope. <u>McAllen v. City of Memphis</u>, 786 S.W.2d 633, 640 (Tenn.
1990). In <u>McAllen</u>, the Tennessee supreme court stated:

> The "fairly debatable, rational basis," as applied to
> legislative acts, and the "illegal, arbitrary and
> capricious" standard relative to administrative acts are
> essentially the same. In either instance, the court's
> primary resolve is to refrain from substituting its
> judgment for that of the local governmental body. An
> action will be invalidated only if it constitutes an
> abuse of discretion. If "any possible reason" exists
> justifying the action, it will be upheld. Both
> legislative and administrative decisions are presumed to
> be valid and a heavy burden of proof rests upon the
> shoulders of the party who challenges the action.

<u>Id</u>. at 641.

The plaintiffs assert that under <u>FW/PBS</u>, a court must
determine whether a licensing board has committed error in denying
an application and not merely whether such determination was made
in "clear error" or if it was "arbitrary or capricious." In
support of their contention, the plaintiffs rely on the following
statement from <u>FW/PBS</u>: "[T]here must be the possibility of prompt
judicial review in the event that the license is <u>erroneously</u>
denied." <u>FW/PBS</u>, 493 U.S. at 228, 110 S.Ct. at 606, 107 L.Ed.2d at
620 (emphasis added). They contend that the Registration Act's
employment of the "arbitrary or capricious" standard of judicial
review is in contravention of the precept pronounced in <u>FW/PBS</u>.
The Court disagrees.

The statement on which the plaintiffs rely in <u>FW/PBS</u> does not
support their contention. When making that statement, the Court
was distinguishing between the procedural protections required

47

under a licensing scheme as opposed to a censorship scheme. The
Court was merely summarizing the procedural protections espoused by
the Court in Freedman and was explaining that not all of those
protections set forth in Freedman were required. FW/PBS, 493 U.S.
at 228, 110 S.Ct. at 606, 107 L.Ed.2d at 620. The Court in FW/PBS
stated, "The core policy underlying Freedman is that the license
for a First Amendment-protected business must be issued within a
reasonable period of time, because undue delay results in the
unconstitutional suppression of protected speech." Id. The Court
went on to conclude:

> Thus, the first two safeguards are essential: the
> licensor must make the decision whether to issue the
> license within a specified and reasonable time period
> during which the status quo is maintained, and there must
> be the possibility of prompt judicial review in the event
> that the license is erroneously denied.

Id.

The Court in FW/PBS was clearly concerned with an applicant
receiving prompt judicial review of an adverse decision by the
board. There is no mention by the Court as to what standard of
review a court should utilize in reviewing a decision by a
licensing board. Likewise, in formulating its procedural
requirements in Freedman, the Court stated, "[T]he procedure must
also assure a prompt final judicial decision, to minimize the
deterrent effect of an interim and possibly erroneous denial of a
license." Freedman, 380 U.S. at 59, 85 S.Ct. at 739, 13 L.Ed.2d at
655. Again, the Court in Freedman was concerned with an applicant

48

receiving prompt judicial review of an adverse decision by the board. The reference to an "erroneous denial" does not specify a standard of judicial review but instead is a generic reference to an incorrect decision by a licensing board.

Further, the plaintiffs have not shown that the "arbitrary or capricious" standard of review is constitutionally inadequate. Tennessee law provides that an action will be invalidated if a local governmental body acted with an abuse of discretion. McAllen, 786 S.W.2d at 641. In McAllen, the court stated:

> If the exercise of authority by the governmental body can be classified as arbitrary or capricious, courts have routinely provided relief:
>
> > [An] abuse of discretion means action that is in opposition to the intent and policy of the statute and of the ordinance adopted comfortably to its provisions, as applied to the facts and circumstances of the case.

Id. at 640-41 (citation omitted). The Court finds that this standard of review is sufficient in fulfilling the constitutional requirements as set forth in Freedman and FW/PBS. Accordingly, the plaintiffs' contention fails.

49

## c. maintaining the status quo[33]

In their complaint (Docket Entry No. 1) ¶ 35, the plaintiffs contend that in the case of an existing business whose application for a license is denied, there is no provision in the Registration Act which maintains the status quo pending judicial review of the board's decision should it take longer than the 120-day period for submitting an application. The defendants argue that the Registration Act provides for an 120-day grace period, in which the status quo is maintained for existing adult-oriented establishments. They contend that if an applicant timely submits an application then the board could rule on the application and, if need be, a court could provide judicial review prior to the expiration of the 120 day grace period.

Tennessee Code Ann. § 7-51-1104(e) (2001) provides:

> All existing adult-oriented establishments, entertainers, employees, escorts, or operators, at the time this part is given local effect pursuant to § 7-51-1120, must submit an application for an appropriate license or permit within one hundred twenty (120) days of this part becoming effective in such county. If a license is not issued within such one hundred twenty-day period, then such existing adult-oriented establishment shall cease to operate.

---

[33]In their proposed findings of fact and conclusions of law, the plaintiffs do not address the issue of maintaining the status quo pending judicial review. However, they raise this issue in their complaint, and the defendants make reference to this issue in their proposed findings of fact and conclusions of law. The Court will, therefore, briefly address this issue.

50

The record reveals that Mr. Friedman applied for a license within the 120-day grace period and therefore was in technical compliance with § 7-51-1104(e). The defendants try to shift the burden upon an applicant and seem to assert that an applicant should apply as soon as possible in order for the applicant to receive a decision within the 120-day period.[34] However, § 7-51-1104(e) only requires that an applicant file an application within 120 days of the county adopting the Registration Act. Mr. Friedman complied with this directive.[35]

Further, Freedman and FW/PBS require that the status quo be maintained, pending decision as to whether a license should issue. In discussing the issue of the status quo being maintained for existing business in a Memphis City ordinance, the Court in East Brooks Books noted, "[T]he ordinance has been amended to allow sexually oriented businesses in operation at the time the ordinance

---

[34]This issue was not presented to the Court in Odle, 421 F.3d at 391-92. There the Court noted that the plaintiffs did not address the 120-day grace period but instead argued that the only constitutionally acceptable way to maintain the status quo was by the issuance of temporary permits that expire after a final determination on the merits. Assessing the Registration Act on its face, the Sixth Circuit could not say that the 120-day grace period was insufficient in upholding the status quo requirement. Id.

[35]Although Mr. Prince elected not to file an application, as stated previously, he has standing to challenge this provision on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license. Freedman, 380 U.S. at 56, 85 S.Ct. at 737, 13 L.Ed.2d at 653.